**Michael J. McNEELY, Appellant,**

**v.**

**Anthony J. PRINCIPI, Acting Secretary of Veterans Affairs, Appellee.**

**No. 90–1539.**

United States Court of Veterans Appeals.

Oct. 9, 1992.

Before IVERS, Associate Judge.

MEMORANDUM DECISION

IVERS, Associate Judge:

Michael J. McNeely appeals from a September 17, 1990, Board of Veterans' Appeals (BVA or Board) decision which denied his claims for service connection for post-traumatic stress disorder (PTSD), hearing loss, and a left eye disorder and which denied his claim for an increased (compensable) rating evaluation for his service-connected residuals of shell fragment wounds of the left calf. Although both parties filed briefs in this case, summary disposition is appropriate here because the case is one "of relative simplicity" and the outcome is controlled by the Court's precedents and is "not reasonably debatable". *Frankel v. Derwinski,* 1 Vet.App. 23, 25–26 (1990). The Court has jurisdiction of the case under 38 U.S.C. § 7252(a) (formerly § 4052(a)). For the reasons set forth below, the Court affirms the decision of the Board in part and vacates and remands the decision in part. For the sake of clarity, the claims are set out separately below.

The veteran served in the United States Marine Corps from June 1963 to June 1967 (R. at 12), including service in Vietnam during which he participated in many combat expeditions. R. at 101–02. His principal duty was machine gunner. R. at 12, 103–04. In July 1966, Mr. McNeely was injured when he was hit by shrapnel from an exploding mortar. R. at 6, 101. He suffered multiple wounds to his head, right arm, and left leg. R. at 6, 101. These wounds included a 1 × 2 cm wound in the left eyebrow, a 1 × 2 cm wound over the lateral aspect of the left eyebrow, and 1 × 3 cm wound of the left calf. R. at 6. In

1968, he was granted service connection at a noncompensable rate for residuals of shell fragment wounds to the left side of the head, the right elbow, the left thigh, and the left calf. R. at 23. The rating board that awarded service connection for these injuries noted that "[a]lthough no single injury involved warrants a compensable evaluation, a 10% evaluation is being assigned under provisions of VAR 1324 in view of the fact that the veteran has multiple retained foreign bodies from shrapnel injuries, and has subjective complaints at times." R. at 23. His service medical records do not reveal any other ailments pertinent to the claims on appeal. R. at 1–11.

The Secretary of Veterans Affairs (Secretary) filed a brief in this case arguing that the decisions of the Board with regard to each of appellant's claims were not clearly erroneous and that therefore the Court should affirm the decision of the BVA. In his brief, appellant argues that his case should be remanded to the BVA for further development because (1) the decision lacks adequate reasons or bases for the Board's findings and conclusions as required by 38 U.S.C. § 7104(d) (formerly § 4004(d)) and as articulated by this Court's holding in *Gilbert v. Derwinski*, 1 Vet.App. 49 (1990); (2) the decision is clearly erroneous; (3) the BVA failed to apply the benefit of the doubt doctrine; and (4) the VA and the BVA failed in their duty to assist the veteran as required by 38 U.S.C. § 5107(a) (formerly § 3007(a)).

PTSD

The veteran made a claim for service connection for PTSD in June 1988. R. at 26. At that time, he requested that the Veterans' Administration (now Department of Veterans Affairs) (VA) obtain records from the Vet Center in Greenville, North Carolina, where he was receiving treatment. R. at 26. The VA immediately requested those records. R. at 29. In addition, Mr. McNeely received a psychiatric screening examination by a VA psychiatrist in July 1988. R. at 32–38. The psychiatrist reported the following under a section of the medical report form where the examiner records the medical history "as related by person examined":

> [Patient] states he has almost constant intrusive memories of his [fifteen] month combat experience in Marines at Viet Nam, at beach landings, etc., witnessing [seven] friends killed; memories triggered by hot weather, rainy weather especially. Increasingly irritable at home with wife and has sought marital counselling for this. Functions [okay] at job; no flashbacks or nightmares, feels detached from all people, unable to be intimate and expects to die soon (not suicidal). No physiologic signs.

R. at 32. Moreover, under the section on the report form for "Diagnosis," the psychiatrist noted as follows: "Does not meet criteria for PTSD (lack of physiological signs, lack of job impairment; unclear whether past combat trauma is related to marital problems)." R. at 35. Finally, on a clinical record form under a section for "Identifying information and presenting problem," the psychiatrist noted as follows: "Adjustment disorder [with] depressed mood—mild[;][d]eclines treatment [with] med[ication]s or group therapy[,] etc." R. at 38.

Based on this report, the VA Regional Office (RO) issued a rating decision dated December 6, 1988, denying service connection for PTSD, observing that the "[o]utpatient treatment report ... noted adjustment disorder with depressed mood and the veteran was referred to the Vet Center" and that "[t]he examiner found that the veteran did not meet the criteria for PTSD because of lack of physiological signs, lack of job impairment and [because it was] unclear whether the past combat trauma is related to the veteran's marital problems." R. at 44–45. On December 19, 1988, the RO received a letter from Harold McMillion, Ed.D., a team leader at the Vet Center in Greenville, North Carolina, stating that the veteran "was first seen at the Vet Center on May 27, 1986[,] presenting emotional problems relating to his military service with the U.S. Marine Corps in Vietnam during 1966." R. at 46. Mr. McMillion further stated that "[b]ased on a complete review of his military record and substanti-

ation of a Purple Heart, it can be clearly established that combat stressors were present during his Vietnam experience" and that "[d]ocumentation of past history indicates that Mr. McNeely displays symptoms of [PTSD] which interferes [sic] with his daily functioning." *Id.* In response to this letter, the RO issued another rating decision dated December 22, 1988, confirming the previous denial of service connection for PTSD without comment. R. at 50.

On December 29, 1988, the VA received a Notice of Disagreement (NOD) from the veteran (R. at 53), and shortly thereafter issued a Statement of the Case, dated January 13, 1989. R. at 55–58. On VA Form 1–9, dated February 6, 1989, the veteran stated that he felt that his psychiatric examination for PTSD had been inadequate because it had only lasted for fifteen to twenty minutes and because the examining doctor did not have medical information regarding the veteran's past history. R. at 59. Therefore, the veteran requested that another examination be administered. *Id.* A hearing was held at the RO on April 27, 1989, where the veteran reiterated his request for another examination for PTSD. R. at 62. The hearing officer denied the request for reexamination, stating that "the testimony at the hearing, as well as findings of record, do not justify a reexamination, as the requisite findings necessary to support the diagnosis of PTSD under the criteria of DSM–III [Diagnostic and Statistical Manual of Mental Disorders, Third Edition, American Psychiatric Association] are not found." R. at 80. The RO issued a rating decision, dated June 21, 1989, continuing the denial of service connection for PTSD. R. at 87.

On September 8, 1989, the BVA remanded the case to the agency of original jurisdiction in order to (1) obtain the veteran's service personnel records for the period of his active service with the Marines with special emphasis on obtaining records regarding his duties and assignments while serving in Vietnam; (2) obtain the veteran's complete records from the Vet Center, Greenville, North Carolina; and (3) provide an examination by a board of two psychiatrists, competent in diagnosing and treating PTSD, who had not previously examined the veteran, in order to determine the correct diagnostic classification of any psychiatric disorder present and to determine whether the diagnostic criteria for PTSD were satisfied. R. at 89–91. (The BVA did not render a decision at this time on the claims for service connection for hearing loss or a left eye disorder or on the claim for an increased evaluation for the veteran's service-connected residuals of shell fragment wounds of the left calf.) As a result of the remand, the military personnel records were obtained (R. at 95–104) and the psychiatric examinations conducted. R. at 106–09. With regard to the records from the Vet Center, a copy of Harold McMillion's letter dated December 5, 1988, was received with a handwritten statement from Mr. McMillion, dated October 2, 1989, added at the bottom. R. at 94.

The first examination was conducted by a panel of two psychiatrists on November 1, 1989, and the impression was "possible PTSD" with the psychiatrists adding that "[w]e would need psychological testing to further document this." R. at 110. After reviewing the results of subsequent psychological testing, the psychiatrists rendered a diagnosis on February 9, 1990, of dysthymic disorder. *Id.* Dysthymia is defined as "morbid anxiety and depression accompanied by obsession." Webster's Medical Desk Dictionary 197 (1986).

The veteran was given a second examination, the report of which is dated January 18, 1990, by a clinical psychologist who administered the following "assessment procedures": Wechsler Adult Intelligence Scale–Revised (WAIS–R); Minnesota Multiphasic Personality Inventory (MMPI) and Keane Scale; Sentence Completion Test (SCT); Mooney Problem Check List; Figley Structured Interview for PTSD–Revised; Draw–A–Person (DAP); and a clinical interview. R. at 108. The psychologist opined that "although PTSD type symptoms are described, he does not appear to meet all the DSM–III–R criteria required for PTSD diagnosis" and added that "the symptom picture may be complicated by physical factors affecting psychological

condition and further exacerbated by marital and occupational problems." R. at 109. The psychologist's diagnostic impression was "Axis I—[Rule Out] Somatoform Pain Disorder vs. Psychological Factors Affecting Physical Condition[;] Marital Problems." *Id.*

█ Based on the evidence gathered in response to the BVA remand, the RO issued a rating decision dated March 28, 1990, denying service connection for PTSD. R. at 111–13. The rating board commented:

> While it is recognized that veteran has had combat stressors, the current psychological and psychiatric testing by the VA does not establish that the veteran has [PTSD] at this time. In addition, service connection is denied for a currently diagnosed dysthymic disorder, which was not found in service nor [sic] at the initial VA examination in 1968, but is of more recent development.

R. at 113.

In upholding the decision of the RO denying service connection for PTSD, the BVA noted, inter alia:

> VA psychiatric screening in July 1988 revealed findings attributed to an adjustment disorder with depressed mood. While subsequently dated statements from a team leader at a Vet Center refer to the veteran's psychiatric treatment and history of symptoms which were attributed to ... [PTSD], the report of a VA psychiatric examination in November 1989 by a panel of two psychiatrists, as well as a VA psychological evaluation in January 1990, do not confirm the diagnosis of [PTSD]. Instead, the psychiatric symptoms were primarily attributed to a dysthymic disorder. While we acknowledge the veteran's exposure to stressors in Vietnam, including his combat injuries, the clinical evidence does not persuasively document the presence of [PTSD].

*Michael J. McNeely,* BVA 90–31882, at 5 (Sept. 17, 1990). Based on its review of the evidence of record, the Board found that that evidence "does not show the constellation of symptoms diagnostic of ... [PTSD] nor has such disorder been clinically confirmed." *Id.* at 7. Such a finding is a factual determination that this Court can only "hold unlawful and set aside ... if the finding is clearly erroneous." 38 U.S.C. § 7261(a)(4) (formerly § 4061(a)(4)); *Gilbert,* 1 Vet.App. at 52–53. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also Gilbert,* 1 Vet.App. at 52. In determining whether a finding is clearly erroneous, "this Court is not permitted to substitute its judgment for that of the BVA on issues of material fact; if there is a 'plausible' basis in the record for the factual determinations of the BVA ... we cannot overturn them." *Gilbert,* 1 Vet.App. at 53. Based on a thorough review of the record, the Court holds that there is a plausible basis in the record, given the opinions expressed in the reports of the panel of two psychiatrists and the clinical psychologist, for a finding that a diagnosis of PTSD is not warranted in this case. The Court is also satisfied that the BVA decision meets the "reasons or bases" requirements of 38 U.S.C. § 7104(d)(1) (formerly § 4004(d)(1)), and the benefit of the doubt doctrine of 38 U.S.C. § 5107(b) (formerly § 3007(b)). Therefore, the Court affirms the decision of the BVA denying the claim for service connection for PTSD.

## Hearing Loss

The veteran first claimed service connection for hearing loss in June 1988, attributing his present hearing loss to having been exposed to the concussion from an exploding mortar in service. R. at 26. In support of his claim, he submitted two audiometric examination reports from his place of employment, one dated 1987 and the other dated 1982. R. at 27–28. Pursuant to his claim, a VA doctor examined his ears in July 1988 and noted that the "canals [were] clear" and that the "t[ympanic] m[embrane]s [were] intact bilat[erally]." R. at 33. Tympanic membrane is defined as "a thin membrane that separates the middle

ear from the inner part of the external auditory meatus and functions in the mechanical reception of sound waves and in their transmission to the site of sensory receptions—called also *eardrum, tympanum.*" WEBSTER'S MEDICAL DESK DICTIONARY 738. Under "Diagnosis," the doctor also noted "alleged hearing loss—audiometry pending" and ordered that an audiometic test be scheduled. R. at 35. A VA medical progress note dated October 12, 1988, showed that the veteran had "bilaterally symmetrical sensorineural hi[gh] frequency loss with good discrimination bilaterally." R. at 40. The veteran was recommended for a hearing aide. R. at 39. The VA denied service connection for the hearing loss in a rating decision dated December 6, 1988, acknowledging the present evidence of hearing loss but noting that the veteran's "service records contain no evidence of ... hearing loss." R. at 44. On December 22, 1988, the RO confirmed the denial of service connection for hearing loss, noting that "[outpatient record]s refer to hearing loss on a current basis." R. at 50. On December 29, 1988, the VA received an NOD from the veteran (R. at 53), and shortly thereafter issued a Statement of the Case, dated January 13, 1989. R. at 55–58. In the Statement of the Case, the reason for the decision denying the claim for hearing loss was that "[h]earing loss is not shown in service." R. at 58. In his substantive appeal, the veteran contended that "the situation of combat and loud noises was a considering factor in my hearing loss" and that "the concussion and noises from the mortar, itself, were enough to damage my hearing...." R. at 59. At his RO hearing in April 1989, the veteran testified that he did not notice any problem with his ears after the explosion and that the first time he had a hearing test was in 1982. Moreover, he testified as follows:

> I didn't really know I had a hearing loss. I thought this was natural as age progressed. I was not given a physical when I was discharged at Camp Lejeune in 1967. Nothing. The first time I found out I had a hearing loss was when I started working where I work now. They gave me a hearing test ... at the company....

R. at 63.

Both the veteran's enlistment and separation examinations showed that his ears were "normal" and that voice testing showed hearing of 15/15 bilaterally. R. at 1–2, 10–11. No audiometric tests were performed at either enlistment or separation. R. at 2, 11. His other service medical records do not show any problems with his hearing or his ears. R. at 5–9. In denying his claim for service connection, the BVA "acknowledge[d] that the veteran was exposed to acoustic trauma in service" but stated that "without documentation of hearing loss until so many years after discharge, we are unable to reach a favorable decision." *McNeely,* BVA 90–31882, at 6.

This Court has had several opportunities to review decisions of the Board involving combat veterans or veterans exposed to loud noises, such as that from weapons fire, who claim service connection for hearing loss years after separation from service. *See, e.g., Smith v. Derwinski,* 2 Vet.App. 137 (1992); *Sanchez v. Derwinski,* 2 Vet.App. 330 (1992). As with any other claim for VA benefits, the initial burden in making a claim for service connection for hearing loss is upon the claimant. The law requires that "a person who submits a claim for benefits ... [must bear] the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a) (formerly § 3007(a)). "A well-grounded claim is a plausible claim, one which is meritorious on its own or capable of substantiation." *Murphy v. Derwinski,* 1 Vet.App. 78, 81 (1990).

In this case, Mr. McNeely made a claim in 1988 for service connection for hearing loss, alleging that his present hearing loss was caused by a mortar which exploded near him in 1966 during his service in Vietnam. In support of his claim, the appellant submitted the results of two audiometric examinations, one dated in 1982 and one in 1987. While the examination reports are evidence of a hearing loss as early as 1982,

the reports are not "sufficient to justify a belief by a fair and impartial individual that the claim is well grounded" because the reports do not support the veteran's claim that his hearing loss was incurred in service. 38 U.S.C. § 5107(a). Therefore, the Court holds that the veteran's claim was not well grounded and the VA was not required to fully adjudicate the claim. *See Tirpak v. Derwinski,* 2 Vet.App. 609, 610 (1992) (doctor's opinion that veteran's death *may or may not* have been averted if medical personnel could have effectively intubated him was too speculative to make appellant's claim for death benefits well grounded); *Sanchez,* 2 Vet.App. at 333 (veteran's allegation that separation examination was inadequate would not constitute material evidence sufficient to reopen a previously denied claim for service connection for hearing loss because the evidence would not establish that his current hearing problem had its inception during service). Because the veteran's claim was not well grounded, any error by the BVA in its subsequent adjudication of the claim is therefore harmless. *Tirpak,* 2 Vet.App. at 610; *Sanchez,* 2 Vet.App. at 333; *Kehoskie v. Derwinski,* 2 Vet.App. 31, 34 (1991). The decision of the BVA denying the veteran's claim for service connection for hearing loss is affirmed.

Left Eye Disorder

The veteran claimed service connection for a left eye disorder in June 1988. R. at 26. He noted that the shrapnel wounds to his head occurred above his left eye and stated that he now experienced blurred vision and vision that "comes and goes." R. at 26. In response to the veteran's claim, the VA ordered an examination at the eye clinic. R. at 33, 35. On VA Form 21–2507, Request for Physical Examination, the following note was entered under "[o]ther [d]isabilities ... for which examination is requested": "[b]lurred vision in left eye—[f]urnish opinion as to etiology." R. at 31. The one-page handwritten report of the eye examiner is largely illegible, but two problems with the veteran's eyes were noted as follows: "early presbyopia—rec. reading glasses" and "mild [illegible] macular RPE ▲-unclear whether old [illegible], solar or drug (all [negative] by [history])." R. at 36. (The Board has translated "RPE ▲" as "retinal pigment epithelium changes". *McNeely,* BVA 90–31882, at 5.) Although the VA, in ordering the eye examination for the veteran, requested specifically that an "opinion as to etiology" be furnished, the examination report did not clearly provide such an opinion, unless the note "unclear whether old [illegible], solar or drug" next to the diagnosis "R[etinal] P[igment] E[pithelium] [changes]" is an attempt to articulate common causes of that eye disorder. Finally, another notation made by the doctor states "will have p[atien]t return for f[urther] a[ssessment] to see level of lesion [illegible] ..." *Id.* The only evidence in the record of any additional examination of the veteran pertaining to his eye is a radiologic report of x rays taken the same day of the eye examination. R. at 37. That report noted the following:

> Several small metallic fragments are identified over the left side of the frontal and frontal parietal region. The majority of these appear to be within the subcutaneous tissues. No fracture or evidence of osteomyelitis is appreciated.

*Id.* Osteomyelitis is defined as "an infectious inflammatory disease of bone marked by local death and separation of tissue." WEBSTER'S MEDICAL DESK DICTIONARY 502.

Based on the evidence of record, including the 1988 eye examination, the BVA provided the following in its DISCUSSION AND EVALUATION section regarding its denial of the veteran's claim:

> We note that [the veteran's] service medical records are negative for any complaint, finding, or diagnosis of a left eye disorder. Uncorrected distant vision at entry and at separation was reported as 20/20. Although the veteran was treated during July 1966 for multiple shrapnel wounds including over the lateral aspect of the left eyebrow, there was not evidence of any left eye injury. When the veteran was examined by the VA in January 1968, a routine evaluation of the left eye was normal. Importantly, the veteran first complained of left eye blurring during an examination by the VA in

July 1988. He was found to have presbyopia, a refractive error and not a disease for compensation benefits. *Although retinal pigment epithelium changes of the left eye were also noted, we find no reasonable basis for relating them to service about 20 years earlier.* Overall, the evidence does not show that the veteran injuried [sic] his left eye in service or that any current left eye pathology is of service origin.

*McNeely,* BVA 90–31882, at 5–6 (emphasis added).

Presbyopia is "a visual condition that becomes apparent esp[ecially] in middle age and in which loss of elasticity of the lens of the eye causes defective accommodation and inability to focus sharply for near vision." WEBSTER'S MEDICAL DESK DICTIONARY 573. Given this definition, it is reasonable to conclude, in addition to noting that the condition was a noncompensable refractive error, that it is not the result of an injury in service. The diagnosis itself provides the plausible basis in the record upon which the Court could hold that the determination of the BVA with regard to this ailment was not clearly erroneous.

█ However, with regard to the condition which the examining physician called "RPE ▲," which the Board has translated as "retinal pigment epithelium changes," the Board offered no reasons or bases for its conclusion that there is "no reasonable basis for relating [retinal pigment epithelium changes] to service about 20 years earlier" (*McNeely,* BVA 90–31882, at 6). The lack of reasons or bases "frustrate[s] effective judicial review" (*Gilbert,* 1 Vet.App. at 57, *quoting Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)) in particular in this case because the doctor's sketchy, handwritten report hardly provides a clear, articulate rendering of plausible bases upon which the Court may justify an affirmance of the BVA's perfunctory conclusion. The VA requested that the doctor furnish an opinion as to etiology with regard to the veteran's eye condition. Although the doctor's abbreviated, handwritten notation that states "unclear whether old [illegible], solar or drug (all [negative] by history)" appears to offer common causes of the ailment and then to rule them out, there are no legible statements in the report directly affirming or denying a connection between the left eye disorder and the wounds to the veteran's head near his left eye. It is clear from the report that the doctor was aware of the veteran's "[history] of shrapnel wound left side of head" because those words were written on the top of the consultation sheet upon which the doctor made his notes. R. at 36. Therefore, the absence of remarks by the doctor regarding a connection between the shrapnel wounds and the eye disorder may form a plausible basis in the record for the BVA's determination that there is "no reasonable basis for relating" the two, but it is not the function of this Court to postulate, from what is not said in a doctor's report, reasons or bases that possibly undergird the BVA's decision. Accordingly, the Court vacates the decision of the BVA on this issue and remands the matter to the Board for readjudication and further development as necessary and for a clear statement of the reasons or bases upon which the Board's decision on remand is based. The statement of reasons or bases required by 38 U.S.C. § 7104(d) (formerly § 4004(d)) shall meet the standard articulated by this Court in *Gilbert,* 1 Vet.App. at 56–57. Specifically, the Court instructs the Board to explain the eye disorders found upon examination as well as the doctor's remarks with regard to the etiologies of those disorders in terms that will be understandable to the veteran and that would facilitate effective judicial review. *Id.* Furthermore, given the notation by the doctor in the 1988 examination that the patient "return for f[urther] a[ssessment]", the Court directs the Board that if further examination is necessary in the readjudication of this claim, such examination must be accomplished.

### Increased (Compensable) Evaluation for Service-Connected Residuals of Shell Fragment Wounds of the Left Calf

When the veteran filed a claim for service connection for PTSD, hearing loss, and a left eye problem in June of 1988, he

mentioned no problem with his left leg nor did he make any claim regarding his shrapnel wounds in general. R. at 26. However, during a VA examination for the claimed disorders in July 1988, the veteran told the examiner that he experienced some numbness in his left calf when squatting. R. at 41. The doctor examining his leg in July 1988 found no problems with his leg upon examination but recommended further tests be administered to check "nerve conduction velocities." *Id.* The results of a subsequent electromyogram administered in October 1988 showed "no evidence of l[eft] peroneal neuropathy and no evidence of a sensory peripheral neuropathy." R. at 43. At his hearing in April 1989 the veteran testified that his leg occasionally aches in the area of the shrapnel wound in his calf. R. at 72–74.

In denying the claim for a compensable evaluation for residuals of the shell fragment wound to the left calf, the BVA found, inter alia, that "the veteran's residuals of shell fragment wound of the left calf primarily consist of a nontender, well-healed faint scar which is not productive of any type of functional impairment involving the left lower extremity." *McNeely,* BVA 90–31882, at 6–7. The Court holds that the appellant has not demonstrated that the BVA committed either legal or factual error which would warrant reversal or remand on this issue. The Court is also satisfied that the BVA decision meets the "reasons or bases" requirements of 38 U.S.C. § 7104(d)(1) (formerly § 4004(d)(1)), and the benefit of the doubt doctrine of 38 U.S.C. § 5107(b) (formerly § 3007(b)). *See Gilbert,* 1 Vet.App. at 53–57. Therefore, the Court affirms the decision of the BVA denying an increased evaluation for residuals of a shrapnel wound to the left calf.

Conclusion

Upon consideration of the briefs of both the Secretary and the appellant and a review of the record, the Court AFFIRMS the decision of the Board with regard to its denial of service connection for PTSD and hearing loss and its denial of an increased (compensable) rating of residuals of a shell fragment wound to the left calf. For the reasons stated in this decision, the Court VACATES the decision of the Board denying service connection for a left eye disorder and REMANDS that matter for readjudication consistent with this decision.